## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DIANE GRIMES<br>52 Neeta Trail<br>Medford Lakes, NJ 08055 | : <br> : <br> : <br> : |
| Plaintiff | :  CIVIL ACTION NO.<br> : |
| vs. | : <br> : |
| IMMACULATA UNIVERSITY<br>1145 W King Road<br>Immaculata, PA 19345 | :<br> :  **JURY TRIAL DEMANDED**<br> :<br> : |
| Defendant. | : |

## COMPLAINT

Plaintiff, Diane Grimes ("Professor Grimes" or "Plaintiff"), by and through her undersigned attorneys, Griesing Mazzeo Law, LLC, hereby files this Complaint and initiates this action to seek redress against her employer, Defendant, Immaculata University ("Immaculata," the "University," or "Defendant"), for unlawful age discrimination and retaliation in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), unlawful gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and Title IX of the Education Amendments of 1972 ("Title IX"), unequal pay in violation of the Equal Pay Act, 29 U.S.C. § 206 *et seq.*, violation of the Pennsylvania Human Relations Act 43 P.S. § 951 ("PHRA"), breach of contract, conversion, and intentional infliction of emotional distress.

## PARTIES

1.     Plaintiff, Diane Grimes, is an adult woman residing at 52 Neeta Trail, Medford Lakes, NJ 08055.  Professor Grimes is currently employed by Defendant and has been since 2005.

1

2.      Defendant, Immaculata University is an institution of higher education driven by Catholic Intellectual tradition and has a principal place of business at 1145 West King Road, Immaculata, PA 19345.

3.      At all relevant times, Defendant has received federal financial assistance and is subject to the provisions prohibiting discrimination under Title IX.

4.      At all relevant times, Defendant, who employs more than 20 employees, is and has been an "employer" as defined under the laws at issue in this suit and is accordingly subject to the provisions therein.

5.      At all relevant times, Plaintiff was and is an "employee" of Defendant within the meaning of the laws at issue in this suit and is accordingly entitled to the protections of same.

6.      At all relevant times, employees of Immaculata acted as agents and servants of Immaculata, within the scope of their authority and in the course of employment under the direct control of Immaculata.

7.      At all times relevant hereto, Immaculata acted by and through its authorized agents, servants, workmen, and/or employees acting within the course and scope of their employment with Immaculata and in furtherance of Immaculata's business.

<u>**JURISDICTION AND VENUE**</u>

8.      This Court has original jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States pursuant to 28 U.S.C. §§ 1331.

9.      This Court has original jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343 (a)(4) because it arises under the laws of the United States and seeks redress for violations of civil rights.

10.     In the alternative, this Court has diversity jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1332.

11.     This Court has supplemental jurisdiction over any Pennsylvania state law claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in the Eastern District of Pennsylvania.

13.     This Court has personal jurisdiction over Immaculata.

**PROFESSOR GRIMES OBTAINED A
RIGHT TO SUE LETTER FROM THE EEOC**

14.     On January 12, 2023, Professor Grimes filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and requested that the EEOC submit the filing to the Pennsylvania Human Relations Commission.

15.     On March 10, 2023, Immaculata filed its position statement in the aforementioned EEOC matter.

16.     On May 12, 2023, Professor Grimes filed her response to Immaculata's position statement.

17.     On June 11, 2023, the EEOC issued A Notice of Right to Sue letter, a true and correct copy of which is attached hereto as **Exhibit "A"**.

18.     Thus, Professor Grimes is now permitted to bring her claims that were the subject of her EEOC action in this Court.

**FACTS**

19.     All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

20.     Professor Grimes is a 63-year-old woman and within the class of individuals protected by Title VII, Title IX, and ADEA from discrimination, harassment and retaliation in employment.

21.     Professor Grimes is a highly skilled and accomplished tenured art professor who has been employed by Defendant since 2005.  Professor Grimes has an extensive track record in successfully establishing a thriving department, developing highly acclaimed courses, managing a team of art instructors, engaging in strategic planning, publishing scholarly work, community service, showcasing artwork, presenting at international conferences, facilitating international travel experiences for students and mentoring students.

22.     Clearly impressed by Professor Grimes, Immaculata hired her as the Chair of its Art Department and granted her tenure.  She also received many accolades and high praise from other faculty, students, administrators, the general art community, associations nationally and internationally and others.

23.     Professor Grimes served as Chair of the Art Department until 2017 when Immaculata consolidated the Art Department into the English, Literature, Communication, and Languages Department.  Following the 2017 merger, Professor Grimes served as the Director of Art Programs and oversaw the Fine Arts, Art History, Graphic Design and Art and Mindfulness Programs.

24.     Throughout her career, Professor Grimes maintained an unblemished and commendable record.  Professor Grimes is widely recognized by others in the field for her exceptional dedication to her students and her unwavering drive to exceed the expectations of her role, all in pursuit of the art program's success.  Her commitment and willingness to go the extra mile have earned her a well-deserved reputation.

25.     Professor Grimes is and has been  party to an employment agreement with the University, entitled "Tenure Ranked Faculty Contract", which is renewed annually (the "Faculty Contract"). The  Faculty Contract incorporates extensive University policies and procedures in the Immaculata University Policy Manual ("Policy Manual") to which the parties are bound. The parties are also specifically bound by the Immaculata University Faculty Personnel Policies set forth in Volume IV of the Policy Manual ("Personnel Policy"). The Personnel Policy expressly provides: "Volume IV of the *Immaculata University Policy Manual* contains general policies and procedures relating to the faculty that are considered binding in faculty contractual agreements." (italics in original). The Policy Manual, including  the Personnel Policy, are also jointly referred to as the "University Policies".  The actions giving rise to this litigation constitute breaches of the employment agreement, the University Policies, and the policies and procedures incorporated therein.

26.     In February 2020, Immaculata unilaterally stripped Professor Grimes of her title and position as Art Program Director without cause and without warning.  Immaculata refused to provide any meaningful explanation for removing Professor Grimes from her position as Director but instead, Immaculata Vice President Angela Tekely scorned that "as V.P.," she "could do whatever [she] want[ed]."

27.     Since then, Immaculata has subjected Professor Grimes to an escalating pattern of discrimination, harassment, bullying and retaliation, and otherwise breached its obligations to Professor Grimes.

28.     After Professor Grimes was ousted from her roles as Department Chair and Art Program Director, Immaculata has subjected her to unfair treatment by imposing additional responsibilities on her without adequate compensation. In particular, when members of the

Immaculata administration, such as her Department Chair and the successor Art Program Director, consistently neglected their duties as it relates to assuring that the art courses were planned, staffed, supplied and run properly, Professor Grimes was often burdened with their essential tasks, despite no longer holding the corresponding title, compensation, or status.

29.     For example, neither the new Chair of the English Department, Sean Flannery ("Chair Flannery"), nor the new Art Program Director, Sister Elaine Marie Glanz ("Sister Glanz"), prepared a budget for art courses, ordered necessary supplies for art courses or timely arranged for adjunct professors to teach many art courses—leaving students scrambling to meet their academic requirements with no instructor showing up.  Immaculata consistently directed that Professor Grimes perform many of these functions when they were neglected by Chair Flannery and Director Sister Glanz for which Professor Grimes was not compensated.

30.     Immaculata's insistence on Professor Grimes performing significant duties of other staff members without receiving appropriate compensation, title or status, exemplified the University's discriminatory animus towards her based on gender and age.  This discrimination became evident as other tenured faculty, namely both male faculty members and younger, less experienced faculty, were not obligated to take on similar additional responsibilities and/or were compensated at higher rates.

31.     In the summer of 2022, Immaculata's discriminatory actions, mistreatment, and harassment towards Professor Grimes reached their peak.  Immaculata desecrated Professor Grimes' office at Loyola 323 and seized, destroyed, burned, distributed, or unlawfully disposed of Professor Grimes' personal belongings, research materials, instructional examples and curriculum, artwork, academic work, course materials, intellectual property, and other belongings.

32.     Professor Grimes was never informed by anyone at Immaculata that her locked office would be accessed by anyone, let alone that the University would interfere with her private and confidential papers stored in locked cabinets that required a concealed key to open.

33.     Immaculata did not possess the authority, permission, or endorsement to engage in the theft, disposal, or destruction of Professor Grimes' professional work, which she had diligently created, accumulated, and safeguarded over a span of 40 years.  Furthermore, the individuals authorized by Immaculata to enter her office not only ruined or discarded a significant amount of documentation that portrayed the value of Professor Grimes' professional work, but they also seized and/or damaged those items. Those items included, without limitation, an entire bookcase of twenty-five years of ongoing research memorialized on historical floppy disks, flash drives, as well as original art.

34.     To compound the desecration of Professor Grimes' office, multiple witnesses reported that members of Immaculata administration offered Professor Grimes' books and other personal property to faculty, passersby and cleaning staff telling them to "take whatever [they] wanted."

35.     During the trashing of Professor Grimes' office and the weeks following the incident, witnesses also heard Sister Glanz, referring to Professor Grimes' art and other valuable work as "trash," calling her a "hoarder" and otherwise harassing Professor Grimes.

36.     Further, in violation of Professor Grimes' contractual and legal rights as well as the University Policies, Immaculata did not create an inventory of the items removed from her office or arrange for storage or safekeeping.

37.     Upon information and belief, it is alleged that members of Immaculata administration dispersed confidential student records and personal documents belonging to Professor Grimes throughout her office.  These documents included personal letters, journals, copies of her passport, and her University contracts containing her salary details. Immaculata irresponsibly left Professor Grimes' office unlocked for an extended period, thereby granting unrestricted access to these private and confidential materials, which were originally stored within a locked cabinet in her locked private office.

38.     When she arrived on campus on August 30, 2022, Professor Grimes first learned of the infringement upon her privacy, interference with her property rights, and breach of her contractual employment rights, and disparaging comments made about her and her work.  To her dismay, she discovered her office door wide open, bookshelves stripped of their contents, file cabinets emptied, and confidential documents scattered around. Furthermore, her personal belongings were carelessly placed in the hallway.  Professor Grimes promptly informed Immaculata about the distressing state of her office.  Regrettably, Immaculata chose to leave her office unlocked and accessible to anyone, prolonging the compromised security of her personal space.

39.     Immaculata did not take any action to assist Professor Grimes in reclaiming the belongings that were improperly taken from her office or given away by Sister Glanz without Professor Grimes' knowledge or consent.

40.     The proffered excuse for Immaculata's plundering of Professor Grimes' University office—that it needed to be "cleaned"—was a pretext.  A thorough examination of both faculty and administration offices across the Immaculata campus reveals that the assault on Professor Grimes' campus office, as well as the destruction and disposal of her belongings, amounted to

discriminatory behavior based on gender and age.  Specifically, there are several other tenured faculty members and administrators, particularly men, whose offices exhibit disorder, unnecessary clutter, potential safety hazards, and a lack of organization compared to Professor Grimes' office. For instance, one male faculty member consistently showcases lit holiday candles in his office, posing a fire hazard, and keeps a throw rug on the floor that presents a further fire and tripping hazard.  Further, another male faculty member's office (which is far more overcrowded than Professor Grimes' office) is swarming with an array of papers and objects, posing a genuine safety hazard, but was showcased and celebrated in the University magazine and regarded as being "worthy of Smithsonian designation."

41.     Furthermore, in an attempt to rationalize its actions, Immaculata made false claims that Professor Grimes had not complied with previous requests to tidy up her office.  This assertion is untrue.

42.     Under University policy and the contractual terms of her employment, Professor Grimes is entitled to her own personal office as a tenured faculty member. Specifically, the Personnel Policy, Volume IV, Appendix 15E states, in pertinent part: **"Faculty Offices** Private offices are provided for all ranked faculty members" (bold in original). Yet, Professor Grimes was pressured to allow Sister Glanz and others to use and encroach upon her dedicated "private" office space. Upon information and belief, no male faculty member was pressured to sharing or accommodating others in their dedicated "private" office space.

43.     Whenever Immaculata requested rearrangements or reorganizations that allowed others to store their belongings in Professor Grimes' office, thus relinquishing the private space assigned to and rightfully belonging to Professor Grimes, she accommodated those requests. These encroachments violated the University's obligations as outlined in Immaculata Personnel Policy

(Volume IV, Appendix 15E, Page 117) which mandates the provision of a private secure office for tenured ranked professors, such as Professor Grimes, and breached the terms of Professor Grimes' Faculty Contract.   Professor Grimes went above and beyond to accommodate Immaculata's unjustifiable demands, but it proved insufficient for Immaculata.

44.     The intrusion into Professor Grimes' privacy, the theft, confiscation, and destruction of her personal belongings served no valid purpose. Immaculata's sole intention was to inflict harm upon Professor Grimes, undermine her professional standing, discard her intellectual property, and decades of her research.

45.     Following the devastating incident and Professor Grimes' reporting of it as discriminatory and harassing, Immaculata caused her to face acts of retaliation, social exclusion, and avoidance from various members of the faculty and administration with whom she previously had amicable relationships.

46.     Since disclosing this highly inappropriate behavior, Immaculata has further retaliated against and harassed Professor Grimes.  Specifically, Immaculata Vice President Tekely has misused her authority by spearheading a campaign to isolate and humiliate Professor Grimes, even openly shunning her in the presence of a witness as recently as November 17, 2022.  After being made aware of the impropriety of the shunning, Immaculata Vice President Tekely singled out Professor Grimes for an ostentatious display of greeting. Both extreme actions by Immaculata, which were witnessed by many others, reflect differential treatment towards Professor Grimes compared to male and/or younger faculty.

47.     Immaculata has been on notice since at least August 30, 2022, of these offenses directed at Professor Grimes and has failed to discipline those responsible or to take prompt action to stop the abuse and to compensate Professor Grimes for her loss.  The University, instead of

acknowledging its wrongdoing, has chosen to downplay the situation and persistently retaliates against Professor Grimes, subjecting her to escalating levels of unfair treatment.

48.     With respect to gender, Immaculata discriminated against Professor Grimes in several ways.  For example, the following reflect further discriminatory treatment of Professor Grimes based on gender:

a.  Immaculata paid Professor Grimes significantly less than her male counterparts and imposed additional responsibilities on her that were not expected of similarly tenured male faculty members;

b.  The University singled Professor Grimes out forcing her to accommodate others in her assigned  private office even though male faculty members did not have to do so. The University also singled out Professor Grimes for unauthorized entry into her office, opening her locked file cabinet, exposing her personal information to public view, destroying or trashing her property without permission or justification, and offering her property to others to take if they pleased. Further, the University's purported explanation—that they needed to "clean" the office—is a pretext given how many other faculty, especially male faculty, have offices that genuinely require cleaning as they are potential safety hazards as described above;

c.  The University failed to acknowledge or commend Professor Grimes' book publication or her extensive art work, while actively promoting and organizing events to celebrate the book publications of male faculty members and purchasing original art to honor a male faculty member's research and publication;

d.  The University has consistently neglected and continues to neglect its responsibility to provide Professor Grimes with the necessary tools and resources to fulfill her

duties. This includes the failure over an extended period to provide her with a functional laptop and printer, while allocating substantial resources to younger male faculty and administrators. Such discrepancies indicate a clear discrimination based on both gender and age;

e.  The University granted male faculty members permission to utilize the campus overnight guest room at no cost to them due to their long commutes, but denied Professor Grimes' request to access the same accommodations despite her residing far away and also having a long evening commute.  This decision to deny Professor Grimes equal access to overnight accommodations on campus was made despite the University being on notice that Professor Grimes was recovering from surgery, which impacted her vision, was remaining on campus after participating in student activities for the benefit of the University, and facing a hazardous drive home at night in a snowstorm with limited visibility;

f.  The University did not shun or punish male staff members for teaching in a solely virtual manner while Professor Grimes was targeted for being on campus less often due to her medical condition and her chaperoning off campus student learning opportunities, as part of her University responsibilities;

g.  The University reprimanded Professor Grimes for missing a faculty meeting, which she informed the University was due to an emergency, while male staff members are repeatedly excused from attending or do not attend without explanation or good cause; and

h.  The University harassed Professor Grimes for displaying  posters on topics of student interest, while allowing male faculty to post materials on campus on manifold subjects.

49.  With respect to age discrimination, Immaculata Vice President Tekely, who is significantly younger than Professor Grimes, has been instrumental in discriminating against Grimes on the basis of her age and condoning mistreatment of Professor Grimes by others. For example, the following reflect discriminatory treatment of Professor Grimes based on age:

a.  Immaculata authorized the purchase of new laptops for younger and less senior faculty members while Professor Grimes was burdened over an extended period with carrying around an external keyboard and mouse due to the outdated and malfunctioning laptop provided to her. This was particularly problematic as Professor Grimes relies on her laptop for remote teaching and art-related activities with her students;

b.  Professor Grimes has been significantly underpaid by the University compared to younger faculty members who have less experience and have made fewer contributions to Immaculata; and,

c.  In contrast to the treatment received by Professor Grimes, the University has not intruded upon the offices of younger faculty and staff members, confiscated and destroyed their belongings, or publicly denigrated their work as "trash."

50.  Following Professor Grimes' report of discrimination and the damage to her University office, she has been subjected to increasing levels of harassment and retaliation by Immaculata. This unlawful treatment by the University and its leaders has intensified, and some specific instances are outlined below:

a.  On the day of Professor Grimes' father-in-law's funeral, while she was grieving, Immaculata President Barbara Lettiere and Vice President Tekely both sent emails to Professor Grimes, issuing threats and reprimands for her failure to respond immediately even though they were on notice of her grieving and personal obligations that day;

b.  Immaculata administration has intentionally disrupted Professor Grimes' classes and monitored her teaching, despite Professor Grimes' extensive experience and high student evaluations in the field of art instruction. This unwarranted monitoring of Professor Grimes' teaching by members of the administration is a targeted act of harassment and retaliation in response to Professor Grimes' complaints of discrimination. It is important to note that other faculty members have not been subjected to such monitoring or oversight without legitimate cause;

c.  Immaculata pulled the textbook Professor Grimes authored from being used in course curriculums while other professors are allowed to use their published text books for courses, and the University subjected Professor Grimes to a committee review before her textbook could be used while male professors who published books were not subjected to the same obstacles in using their published works for teaching purposes;

d.  The University deliberately misrepresented information to law enforcement authorities, leading to the local police's failure to investigate or take appropriate action regarding the vandalism of Professor Grimes' office and the theft of her belongings by Immaculata. These misrepresentations effectively shielded the perpetrators from accountability;

e.  Immaculata administration has publicly shunned and ostracized Professor Grimes, creating a hostile and isolating environment for her within the academic community; and,

f.  Immaculata repeatedly disparages Professor Grimes by referring to her belongings as "trash" and calling her "a hoarder."

51.  Additionally, the University, in an attempt to prevent investigation and action against those responsible for breaking into Professor Grimes' office and file cabinet, resorted to false and/or disparaging statements made to law enforcement.  According to the Incident Report Form prepared by Officer Kemba Daniels of the East Whiteland Township Police Department, dated September 12, 2022, the University misrepresented the following to the Police Department: (1) that Professor Grimes "shared" her office with another staff member; (2) that Immaculata repeatedly instructed Professor Grimes to clean her office but Professor Grimes failed to comply; and (3) that Professor Grimes had a "hoarding issue," causing her office to be deemed a "fire hazard."

52.  Professor Grimes has exclusively used Loyola 323 as her personal office at Immaculata since 2005.  As per her Faculty Contract and the Personnel Policy, all tenured professors, including Professor Grimes, are entitled to their own private office. A sign outside the door of Loyola 323 clearly designates it as Professor Grimes' office and does not indicate any other occupants.

53.  Whenever Immaculata requested the use of Professor Grimes' private workspace, Professor Grimes accommodated the request.  At the conclusion of the Spring semester in 2022, Immaculata informed Professor Grimes that an adjunct instructor required a storage space for supplies due to the repurposing of the Painting Room.  In response, Professor Grimes agreed to

rearrange her own belongings during the summer to create space in her office for the adjunct, fulfilling her commitment as promised.

54.     There are several other campus offices assigned to male faculty in particular that are visibly cluttered with non-teaching-related materials, which could be considered hazardous or suggestive of hoarding behavior.  However, none of these offices were singled out by Immaculata for "cleaning" purposes.

55.     The lies presented to law enforcement, as described above, serve as additional evidence of Immaculata's harassment and disparagement of Professor Grimes.

56.     In addition, the University and its leadership demonstrated a disregard for their own policies in relation to the inadequate investigation of the aforementioned events, their failure to implement appropriate corrective measures or discipline those responsible, and their overall treatment and bullying of Professor Grimes. For example, the Policy Manual Volume II Community Policies ("Community Policies") provide in Section 1.1.3 a "Bullying Policy" which forbids bullying and retaliation for reporting bullying as well as mandating sanctions against those who violate the policy.

57.     Among other things, "Bullying" is defined in Section 2.1.3.2 of the Community Policies to include "Verbal Bullying" and the University violated that policy through a pattern of "intimidating, threatening [and] humiliating" Professor Grimes and by "embarrassing" Professor Grimes and "persuading others to engage in such activities" as Sister Elaine, Vice President Tekely, and others have done. The University also violated Section 2.1.3.2.1 "Verbal bullying" by allowing Sister Glanz and others to engage in "name-calling, spreading malicious rumors, threatening to cause harm, and/or persuading or encouraging another person to engage in such

activities" by, among others, calling Professor Grimes' art, scholarship and research "trash" and calling her a "hoarder."

58.     The University violated Section 2.1.3.2.2 "Physical bullying" by "removing and hiding belongings" as occurred when the University condoned the desecration of Professor Grimes' office and property and Section 2.1.3.2.3 "Relational/social status bullying" by "trying to hurt a peer and/or that peers[sic] standing within a particular peer group often by forming coalitions against someone, spreading rumors, embarrassing someone, excluding someone, and/or persuading others to engage is such activities" by publicly humiliating Professor Grimes, offering for others to "take whatever they want" of her belongings, ostracizing and encouraging others to do so, and shunning her as Sister Glanz and Vice President Tekely have done and continue to do openly and in the presence of others.

59.     The University has also failed to enforce the "No Retaliation" policy of Section 2.1.3.3 or to sanction the wrongdoers under Section 2.1.3.6. To the extent that the administration has attempted to downplay the pattern of bullying and retaliation, contending that "Sister Elaine was only trying to help" by "cleaning the office",  Section 2.1.3.2.4 which provides: "Bullying need not include intent to harm be directed at a specific individual, or involve repeated incidents to constitute a violation of University policy and/or federal, state, or local law." Even so, the facts here support the conclusion that intent to harm existed with respect to the original incident and through the persistent harassment and retaliation after Professor Grimes reported the egregious breach of her privacy and property rights.

60.     The Community Policies also provide in Section 2.1.10 for a "Non-Discrimination and Anti-Harassment Policy and Complaint Procedures similarly prohibiting discrimination, harassment and retaliation for reporting discrimination and harassment.  The University violated

this Policy and Procedure by failing to put a stop to and by participating in relentless harassment and retaliation against Professor Grimes.

61.     This blatant disregard by the University of its own policies highlights the pretextual nature of its excuses for mistreating and discriminating against Professor Grimes and reveals a clear inconsistency between its stated policies and actual conduct. The University also violated Community Policies Section 2.1.14 "Records Retention" by permitting the destruction, incineration, trashing and conversion of University records, including student materials, curricular materials, research, intellectual property, contracts and other records maintained in Professor Grimes' office in defiance of the provisions of "Filing, Archiving, and Storage of Documents" under Section 2.1.14.2 and "Destruction of Documents" under Section 2.1.14.4. These specific policies cover "all records, regardless of form, that are made, produced, executed, received or maintained by employees of the University in the course of carrying out University functions. Records and documentation created in the course of research, whether internally or externally funded are also subject to record-keeping requirements."

62.     The University violated Section 2.3 "Campus Safety and Protection Policies", particularly 2.3.3.10 "Key Management and One Cards" by providing a key to Professor Grimes' private office to Sister Glanz and for allowing Sister Glanz and others to leave the office unlocked with confidential student records and Professor Grimes' private documents then available to any passerby and by refusing to share the Security Office investigation report and findings with Professor Grimes.

63.     The University violated Section 2.8 "Grievances and Complaints" of the Community Policies by failing to engage in fair and meaningful dialogue to address the desecration of Professor Grimes' private office and the conversion and destruction of her property, instead

18

retaliating against Professor Grimes for lodging her grievance making any proceedings futile as Professor Grimes could not be assured of an objective process without further harassment, and for making pretextual excuses for Sister Glanz's violation of Professor Grimes' rights.

64.    The University also violated several provisions of the Personnel Policy including Section 4.6 "Faculty Rights and Responsibilities" particularly Section 4.6.1.3 "Fair and Respected Treatment" by failing to treat Professor Grimes "fairly, respectfully, professionally", failing to keep her "free from arbitrary and capricious action on the part of the University administration and faculty" and failing to protect her "against discrimination that is illegal or unconstitutional".

65.    The University violated Section 4.10 "Faculty Grievances" by failing to abide by the Grievance Procedures and/or making the process futile given that the representatives of Immaculata who engaged in the misconduct control or have undue influence over the process.

66.    Immaculata has breached The Faculty Contract with Professor Grimes by multiple violations of the Policy Manual, including without limitation the Personnel Policy and the Community Policies and failing to abide by its terms and the University Policies incorporated therein and to which the parties were also bound.

67.    Immaculata has subjected Professor Grimes to discrimination on the basis of her age and gender in violation of ADEA, Title VII, and Title IX by continuously treating her less favorably than younger and/or male faculty members.

68.    Immaculata has created and continues to subject Professor Grimes to a hostile work environment with an escalating pattern of discrimination, harassment, bullying and retaliation.

69.    Immaculata has disparaged Professor Grimes in front of other members of its faculty and staff.

70.     Immaculata has incinerated, given away, or otherwise disposed of several of Professor Grimes personal items and is liable for the conversion of such items.

71.     As a consequence of Immaculata's wrongful and discriminatory treatment of Professor Grimes, Professor Grimes has suffered and continues to suffer substantial harm, including but not limited to reputational harm as well as grave physical and mental health issues, including suffering from posttraumatic stress syndrome directly caused by the University's wrongful desecration of her office and theft and destruction of her personal property, the retaliation against her for raising issues of disparate treatment and the ensuing failure to address the severe harm.

## COUNT I
## Breach of Contract

72.     Plaintiff Professor Grimes hereby incorporates by reference all allegations in all previous paragraphs as fully as though the same were set forth at length herein.

73.     The Faculty Contract and incorporated University policies and procedures, including without limitation the Policy Manual and the Personnel Policy and Community Policies included therein between Professor Grimes and Immaculata pertaining to the terms of her employment.

74.     Professor Grimes has fulfilled all of her obligations under the contract between the parties.

75.     As detailed above, Immaculata breached the Faculty Contract and incorporated Policy Manual in numerous material ways including but not limited to:

    a.     failing to act in good faith;

    b.     forcing Professor Grimes to share her private office with other faculty members;

c.  entering her private office without notice for the purpose of destroying or taking her property;

d.  incinerating, giving away, or otherwise disposing of Professor Grimes' personal belongings, intellectual property, artwork, materials for teaching her classes;

e.  failing to create an inventory of items taken from Professor Grimes' office;

f.  denying Professor Grimes a full and fair investigation of the ransacking of her office;

g.  failing to compensate her fairly compared to male and/or younger faculty including without limitation failing to compensate her for work she performed because the Department Chair and the Art Program Director failed to perform their responsibilities;

h.  failing to store her property in a safe manner after removing it from her office;

i.  engaging in discriminatory, harassing and bullying behavior towards Professor Grimes; and,

j.  spreading disparaging statements, and false allegations among the employees of Immaculata and other third parties.

76.  Immaculata also breached the express and implied terms of Professor Grimes' employment.

77.  Immaculata's actions constituted breaches of its implied duty of good faith and fair dealing.

21

78.     Professor Grimes has suffered substantial damages as a direct result of Immaculata's breach of contract and its implied duties of good faith and fair dealing, including, without limitation, compensatory damages, attorneys' fees and costs.

<u>**COUNT II**</u>
**For Age Discrimination in Violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.***

79.     Plaintiff Professor Grimes hereby incorporates by reference all allegations in all previous paragraphs as fully as though the same were set forth at length herein.

80.     Professor Grimes is over forty years of age and is an individual within the class protected by the ADEA.

81.     In discriminating against and harassing Professor Grimes because of her age, and retaliating against Professor Grimes for asserting her rights, Immaculata violated the ADEA.

82.     Immaculata engaged in deliberate and intentional discrimination and harassment against Professor Grimes based on her age.  The University treated her less favorably than younger faculty by paying her less compensation than younger, less experienced faculty, denying her a dedicated office for her exclusive use, failing to provide her with the tools needed for teaching including a working laptop, destroying her office while other younger faculty had offices that were overcrowded and less safe, and allowing younger faculty to work remotely while chastising Professor Grimes for not spending more time on campus.

83.     Moreover, the University retaliated against Professor Grimes for lodging complaints about discrimination and harassment by subjecting her to an increased amount of unwarranted reprimands and humiliating her in front of other staff members.

84.     Immaculata intentionally subjected Professor Grimes to a hostile work environment due to her age.

85.     As a direct result of Immaculata's unlawful employment practices, Professor Grimes has suffered from severe emotional and physiological distress.

86.     Immaculata's conduct was outrageous, malicious, wanton, willful, and showed reckless indifference to the interest of Professor Grimes.

87.     Professor Grimes has suffered substantial damages as a direct result of Immaculata's age discrimination, including, without limitation, compensatory damages, attorneys' fees and costs.

<u>COUNT III</u>
**For Sex Discrimination in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.***

88.     Plaintiff Professor Grimes hereby incorporates by reference all allegations in all previous paragraphs as fully as though the same were set forth at length herein.

89.     Professor Grimes is a female individual within the class protected by Title VII.

90.     Immaculata engaged in unlawful employment practices, in violation of Title VII by discriminating against Professor Grimes on the basis of sex.  This discrimination included, among other things, paying Professor Grimes lower compensation than male tenured faculty, including some with less experience and fewer contributions to the University; forcing Professor Grimes to share her office with others while male faculty were not required to do so; interfering with her personal belongings, by trashing, destroying, discarding and giving them away on the pretext of addressing a "hazard" while allowing male faculty to maintain offices that were far more crowded and hazardous; failing to provide Professor Grimes with a working laptop needed to teach her course while male faculty were provided with laptops and other equipment needed for their teaching; refusing to allow Professor Grimes to use the on campus room for overnight stay without cost when she remained after hours for University business while permitting male faculty to do so; reprimanding Professor Grimes for not spending more time on campus even though some of her

courses were designed to be done on site at art locations while allowing male professors to work entirely remotely; and celebrating and hosting events to honor male faculty book publications while failing to do so when Professor Grimes published a book.

91.     Immaculata intentionally and willfully discriminated against and harassed Professor Grimes because of her sex and retaliated against Professor Grimes because of her complaints about such discrimination.

92.     Immaculata intentionally subjected Professor Grimes to a hostile work environment due to her sex.

93.     Upon information and belief, Immaculata's facially neutral practices, policies, and/or customs had a disparate impact upon female employees at Immaculata in violation of Title VII of the Civil Rights Act of 1964.  For example, upon information and belief, Immaculata did not follow its own practices, policies and/or customs in handling the removal of items from Professor Grimes office and did not subject any male faculty members to the same intrusive cleaning.

94.     As a direct result of Immaculata's unlawful employment practices, Professor Grimes has suffered severe emotional and psychological distress as well as loss of self-esteem.

95.     Immaculata's conduct was outrageous, malicious, wanton, willful, and showed reckless indifference to the interests of Professor Grimes.

96.     Professor Grimes has suffered substantial damages as a direct result of Immaculata's gender discrimination, including, without limitation, compensatory damages, punitive damages, and attorneys' fees and costs.

## COUNT IV
### Sex Discrimination and Retaliation in Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

97.     Plaintiff Professor Grimes hereby incorporates by reference all allegations in all previous paragraphs as fully as though the same were set forth at length herein.

98.     Immaculata, a federally financed educational institution, knowingly engaged in deliberate and intentional discrimination and harassment against Professor Grimes based on her sex and retaliated against Professor Grimes for raising complaints regarding the discrimination she experienced in violation of Title IX and its implementing regulations.

99.     Under Title IX and its implementing regulations, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

100.     Retaliation for reporting discrimination based on sex is also considered sex-based discrimination under Title IX. *Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 174 (2005).

101.     As a direct result of Immaculata's unlawful employment practices, Professor Grimes has suffered severe emotional and psychological distress as well as loss of self-esteem.

102.     Immaculata's conduct was outrageous, malicious, wanton, willful, and showed reckless indifference to the interests of Professor Grimes.

103.     Immaculata's willful violations of Title IX warrant an award of compensatory damages, attorneys' fees and costs, and interest as well as injunctive relief.

## COUNT V
### Unequal Pay in Violation of the Equal Pay Act, 29 U.S.C. § 206, *et seq.*

104.     Plaintiff Professor Grimes hereby incorporates by reference all allegations in all previous paragraphs as fully as though the same were set forth at length herein.

105.   Throughout her career at Immaculata, Professor Grimes has consistently upheld a praiseworthy track record, going above and beyond her mandated job duties, all in pursuit of the Art Department's success.

106.   As mentioned above, despite the University stripping Professor Grimes of her administrative title, she is still consistently burdened with tasks that are not within her official responsibilities.  The same is not expected from the male counterparts having substantially equal job titles, responsibilities and skills working under similar conditions.

107.   Professor Grimes' male co-workers, however, were paid more under these circumstances, in violation of the Equal Pay Act.  Furthermore, her male co-workers enjoyed extra privileges, such as the freedom to stay overnight at the University without being charged the $40 fee that Professor Grimes was required to pay and being excused from staff meetings.

108.   Immaculata's willful violations of the Equal Pay Act warrant an award of compensatory damages, attorneys' fees and costs, and interest as well as injunctive relief.

### COUNT VI
**Violations of the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq.***

109.   Plaintiff Professor Grimes hereby incorporates by reference all allegations in all previous paragraphs as fully as though the same were set forth at length herein.

110.   Immaculata intentionally discriminated against, harassed and retaliated against Professor Grimes on the basis of her age and gender.

111.   Immaculata intentionally subjected Professor Grimes to a hostile work environment due to her age and gender.

112.   In discriminating and harassing Professor Grimes because of her age and gender and in retaliating against Professor Grimes for her complaints of such discriminatory treatment, Immaculata violated the PHRA.

26

113.    As the direct result of the aforesaid unlawful employment practices engaged in by Immaculata, Professor Grimes has sustained actual loss, severe emotion and psychological distress, loss of self-esteem and has incurred attorneys' fees and costs.

114.    Immaculata's conduct was outrageous, malicious, wanton, willful, and showed reckless indifference to the interests of Professor Grimes.

115.    Immaculata's willful violations of the PHRA warrant an award of actual and compensatory damages, attorneys' fees and costs, and interest.

## COUNT VII
### Conversion

116.    Plaintiff Professor Grimes repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

117.    As set forth in more detail above, Immaculata wrongfully entered Professor Grimes private office and locked file cabinets and removed, destroyed, incinerated or offered to others several of Professor Grimes' personal belongings including records reflecting the value of the items that Immaculate that were taken or otherwise interfered with.

118.    Professor Grimes had a possessory interest in the items stored in her office.

119.    Immaculata intentionally interfered with Professor Grimes' possession of these items without authorization.

120.    Immaculata's acts are the cause of Professor Grimes' loss of property.

121.    Immaculata is liable to Professor Grimes for the full fair market value of the property seized.

122.    Immaculata's conduct was outrageous, malicious, wanton, willful, and showed reckless indifference to the interests of Professor Grimes.

27

123.   As a result of Immaculata's wrongful conversion of Professor Grimes' property, she has suffered substantial damages including, without limitation, compensatory damages, punitive damages, and attorneys' fees and costs.

**COUNT VIII**
**Intentional Infliction of Emotional Distress**

124.   Plaintiff Professor Grimes repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

125.   As set forth in more detail above, Immaculata has engaged in a pattern of extreme and outrageous mistreatment towards Professor Grimes by, among other things, intentionally entering her locked office and incinerating, seizing, destroying and giving away her personal belongings, threatening severe consequences when she did not respond during the death of a family member, subjecting her to humiliation in front of other staff members by calling her "a hoarder," referring to her belongings and art work as "trash," openly shunning her in the presence of others, and failing to acknowledge or celebrate her publications and accomplishment while lavishly acknowledging and celebrating male faculty.

126.   Immaculata's behavior and conduct was extreme, outrageous, shocking, and of such egregiousness as to be utterly intolerable in any civilized society, and was specifically directed at Professor Grimes with malice, intending to cause her serious psychological and emotional harm, damage and distress, pain and suffering, and which did indeed directly cause such severe emotional harm, psychological distress and damage.

127.   As a result of Immaculata's intentional infliction of emotional distress, Professor Grimes has suffered substantial damages including, without limitation, compensatory damages, punitive damages, and attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Professor Grimes respectfully requests that this Honorable Court:

i.    enter judgment in Plaintiff's favor and against Defendant on all claims asserted against it above in an amount in excess of $75,000 for actual, compensatory and statutory damages;

ii.    order appropriate equitable relief enjoining Defendant from retaliating against Plaintiff;

iii.    order Defendant to compensate Plaintiff for all items from her office that were taken, damaged, destroyed, given away, or otherwise interfered with;

iv.    order Defendant to compensate Plaintiff for physical injury and emotional distress suffered as a result of their unlawful actions;

v.    order Defendant to pay Plaintiff punitive damages;

vi.    order Defendant to pay Plaintiff's attorney's fees and costs; and,

vii.    grant such other and further relied as this court deems necessary, just and appropriate.

Dated: August 28, 2023                Respectfully submitted,

**GRIESING MAZZEO LAW, LLC**

By:    */s/ Francine Friedman Griesing*
Francine Friedman Griesing, Esq.
Jessica L. Tarapchak, Esq.
Identification Nos. 48982, 333122
1880 John F. Kennedy Boulevard, Suite 1800
Philadelphia, PA 19103
PH: (215) 618-3720
F: (215) 814-9049
fgriesing@griesinglaw.com
jtarapchak@griesinglaw.com
*Attorneys for Plaintiff Diane Grimes*

29